■ In the Matter of KEVIN R., a Child Alleged to be Neglected. PATRICIA R. et al., Appellants; COMMISSIONER OF SOCIAL SERVICES OF THE CITY OF NEW YORK, Respondent. [596 NYS2d 813] —Orders of the Family Court, New York County (Bruce M. Kaplan, J.), entered on March 7, 1991 and on June 14, 1991, which, respectively, made a finding of neglect against the parents and ordered a year of minimal supervision by the Child Welfare Administration, are affirmed, without costs.

Family Court Act § 1046 (a) (ii) provides that a prima facie

351

case of abuse or neglect is established by "proof of injuries sustained by a child * * * of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child". Once a prima facie case is established, the burden of coming forward with the proof shifts from the petitioner to the parents to offer a satisfactory explanation to rebut the evidence of abuse (Matter of James P., 137 AD2d 461, 462).

In the instant case, the finding of the Family Court that five-month old Kevin was neglected was supported by evidence he sustained a spiral fracture of his upper right arm while in the sole care of his parents. This injury, according to the expert testimony of two witnesses, would not have been caused by the child's spina bifida. Further, while there was some testimony by the mother that the injury could have been caused by the infant's two and one-half year old brother, other testimony demonstrated that it was "unlikely" that a two and one-half year old child would have the strength or dexterity necessary to inflict such an injury. Moreover, despite the overwhelming medical evidence that the child would have experienced extreme pain immediately after the injury, and the pain would have continued for several days, the mother testified that prior to the morning of October 10, 1989, when she brought Kevin to the Rusk Institute for an evaluation as to his spina bifida, she observed no swelling or discoloration of the right arm and no indication the child was suffering pain or discomfort. The uncontroverted medical testimony was that multiple signs of injury, including swelling, discoloration, lack of movement of the arm and pain whenever the arm was touched, would have been clearly apparent to the parents and they should have sought medical treatment sooner than October 10. Thus, the record establishes that the parents failed to take prompt and appropriate action to obtain medical treatment for the child after the injury to his arm was readily discernible.

In addition, the Family Court did not abuse its discretion in concluding the parents required the continued services of the agency and ordering a twelve month period of supervision. In any event, since the dispositional order has expired, the issue of the length of the supervision is now moot (Matter of Laura W., 160 AD2d 585, 586, lv denied 76 NY2d 706). Concur— Sullivan, Rosenberger and Asch, JJ.

Murphy, P. J., and Rubin, J., dissent in a memorandum by Rubin, J., as follows: Respondents' five-month-old infant is

afflicted with spina bifida. While pregnant with the infant, the mother became aware that she might give birth to a baby with birth defects, but chose not to abort the pregnancy. The infant was born in Puerto Rico but, in September 1989, the family moved back to New York to obtain medical care from the spina bifida clinic at the Rusk Institute.

On October 10, 1989, the mother brought the infant to the clinic. Dr. Gold, the clinic's director, examined the child and noticed that his right arm was swollen and discolored a yellowish-green. The infant and his mother were immediately sent to Bellevue Hospital where it was determined that the infant had sustained a spiral fracture of the upper arm.

At the adjudication hearing, Dr. Gold stated that spina bifida creates a propensity for fractures to occur "with minimal trauma", noting, "they're bones that lie generally below the area where the spina bifida is located." Dr. Gold stated she had never seen upper extremity fractures associated with spina bifida. She noted that fractures suffered by patients with the condition are related to paralysis and are therefore confined to the lower extremities. Dr. Gold stated with a reasonable degree of medical certainty that the fracture of the infant's arm did not result from spina bifida but was caused by trauma. She further stated that minimal trauma was not sufficient to have caused the injury.

Dr. Melvin Becker, an expert in radiology, examined the x-rays taken of the infant. He determined that the child suffers from spina bifida and observed corner fractures in both of the infant's knees in addition to a spiral fracture of the bone in the upper arm. Dr. Becker stated that the fractures of the infant's knees could have occurred from minimal trauma as the result of spina bifida, but the fracture of the infant's arm necessarily required a twisting motion. Dr. Becker thought it likely that the pain in the infant's arm would have caused him to cry or scream and, in his opinion, the infant's injuries were consistent with the type seen in cases of child abuse.

At Bellevue Hospital's emergency room, the child's mother spoke with Catherine Kramer, a pediatric social worker, who testified that the mother said she first became aware of the swelling in the infant's arm the day before (October 9th). She also noted that the infant had a bruise on his cheek which, the mother stated, the infant's brother had inflicted on him.

The social worker subsequently filed a form 2221, Report of Suspected Child Abuse. This report notes that the mother observed swelling in the infant's arm one day prior to bring-

ing the infant to the hospital. The mother stated that she left the children alone while she was taking a shower three days before. When she came out of the bathroom, the infant's brother was in the crib with the infant and the infant was crying. The mother stated that the brother punched the infant, leaving a bruise on the face. The mother believes the fracture occurred at that time. The report further states that the mother's explanation was questioned due to the age of the infant's brother and concludes that, since the infant suffers from spina bifida and hydrocephalus, tests need to be run to rule out a medical problem in the infant's bones.

At the hearing, the mother described the relationship the infant had with his 2½-year-old brother as troubled. The brother is jealous of the infant because of all the attention he receives and acts out to gain his parents' attention. This behavior includes wanting to carry the infant when seeing his mother do so, trying to get his mother to carry him when seeing her carry the infant and pulling toys from the infant's hands. Consistent with the 2221 report, the mother stated that she had placed the infant in his crib before taking a shower. While showering, she heard the infant start to cry and immediately discovered that his brother had jumped into the infant's crib. She also noticed that the infant no longer lay on his left side, as she had left him, but was now lying in the crib face-up. Dr. Gold agreed that the infant could not turn himself over without assistance. Dr. Gold also agreed that a fracture could have been caused by the brother's grabbing the infant's arm and twisting it.

Dr. Uriel Adar, an expert in pediatric orthopedic surgery, testified for respondents. Dr. Adar stated that children with spina bifida suffer from multiple fractures secondary to even the most minimal force applied upon them. Therefore, there is a likelihood that the infant will exhibit multiple fractures throughout the whole body. Moreover, the bones of the upper extremities are also weaker than those of a normal child because the upper extremities do not get the amount of activity that would normally strengthen them. The doctor also stated that, where a child is paralyzed due to spina bifida, muscle ulcers and sores often result. The absence of such lesions or lacerations on the infant's lower extremities highly impressed Dr. Adar with the good care the infant has received. He stated that because the child suffers from paralysis of the lower extremities, merely lifting him could cause injury as though he were being lifted by only one arm. Dr. Adar concluded that the fracture of the right arm could even have

been caused by the brother pulling an object out of the infant's hands.

On March 7, 1991, Justice Kaplan dismissed abuse and neglect charges brought with respect to the infant's brother but made a finding of neglect as to the infant against the parents, setting the matter down for a dispositional hearing. On June 14, 1991, the petitioning agency recommended release of the children to their parents under minimal supervision for one year, on condition that respondents keep all necessary medical appointments. A contested hearing took place the same day. The record shows that respondents have complied fully with all the recommendations adopted by the court.

Respondents brought this motion to dismiss the neglect petition which was subsequently denied. Family Court noted that the mother had been singularly responsive to the requests made of her and observed that "it was as likely as not that the respondent would continue following the court's recommendation with C.W.A. [Child Welfare Agency] supervision, but that was by no means certain, and the lack of certainty is one factor that disposes the court to deny the application to conclude that the assistance of the court was not necessary." The court recognized the "admirable care" that respondents provide the infant, but nevertheless chose to retain the requirement for one-year's supervision.

Family Court Act § 1046 (a) (ii) provides that a prima facie case of abuse or neglect is established by "proof of injuries sustained by a child * * * of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child." After the petitioning agency satisfies the requirements of this provision, the burden of coming forward with proof shifts to the parents, who are then required to offer a satisfactory explanation for the injuries or conditions suffered by the child (Matter of James P., 137 AD2d 461, 462).

Doctors Becker and Gold diagnosed the infant's upper arm injury as a spiral fracture, and both agreed that the injury is not related to his condition. However, these facts alone do make out a prima facie case of neglect on the part of respondents. Indeed, the weight of the evidence tends to disprove neglect on their part. Doctors Gold and Adar conceded that it was clearly possible the infant's arm could have been broken by his brother. The testimony of the doctors, together with the mother's testimony concerning the infant's scream while she showered and her immediate discovery of the brother in the

crib and the infant's altered position, demonstrates that the fracture to the arm was not caused by a pattern of neglect on the mother's behalf but was, rather, an isolated incident.

Respondents have done everything humanly possible to assist their child. The family has relocated to New York from Puerto Rico, and observation of his condition and therapy are obtained at the clinic on a regular basis. Family Court recognized the "admirable care" that respondents give the infant, but incongruously found that the evidence was sufficient to sustain a finding of neglect. It is hardly inconceivable that the crying which apparently accompanied the fracture to the infant's arm could have been mistaken by laypersons for the general discomfort associated with the condition of spina bifida. Medical treatment was sought promptly after the discoloration of the arm was detected. Therefore, respondents have met their burden to provide a satisfactory explanation for the infant's injury *(Matter of James P., supra),* and the presentment agency has failed to establish neglect by a fair preponderance of the credible evidence. A finding of neglect is unwarranted based on the record before the court and would only serve to stigmatize parents whose loving care and concern for their child is amply demonstrated *(Matter of Foreman,* 75 Misc 2d 348, 349). Nor, based on the parents' conceded compliance with the court's directive in keeping all medical appointments, is there any basis for the conclusion that continued court supervision is required and, under the circumstances, the failure to dismiss the petition constitutes an abuse of discretion (Family Ct Act § 1051 [c]).

Accordingly, respondents' motion should be granted, the finding of neglect vacated, and the petition dismissed, without costs.