■ In the Matter of KARLA V. and Others, Children Alleged to be Abused. SANTA V., Appellant; COMMISSIONER OF THE ADMINISTRATION FOR CHILDREN'S SERVICES OF THE CITY OF NEW YORK, Respondent. [717 NYS2d 598] —Orders, Family Court, New York County (Sara Schechter, J.), entered on or about September 23, 1998, which, after a fact-finding hearing, found appellant guilty of child abuse, unanimously reversed, on the law, without costs, the fact-findings vacated and the matter remanded for a new hearing. Appeal from order, same court

and Judge, entered on or about June 8, 1999, denying appellant's motion for reconsideration and reargument of her March 2, 1999 withdrawal of her motion to vacate and set aside the findings of abuse, unanimously dismissed, without costs.

Respondent-appellant mother, who had no history of abuse or neglect, had three children, ages 17, 11, and 9 months, and an 18 month old grandchild, living with her on March 20, 1998. On that day, she brought her 9-month-old son to the Mount Sinai Hospital Pediatric Clinic for a routine appointment. As medical personnel attempted to draw blood from the child's finger, he forcefully resisted, so that the mother was directed to hold him firmly. The child's crying continued at home, where, that evening, the mother noticed that his arm was sensitive to touch. She then provided hot compresses and Tylenol to the child as she was directed to do during a phone call to the hospital. When the crying continued the next day, the child was taken back to the hospital, where an X-ray indicated a spiral fracture to the humerus. A social worker was called in and the mother informed her that she thought that the fracture had occurred while she was holding the child during the phlebotomy. The social worker contacted the Administration for Children's Services (ACS). That same day, all children were removed from the mother's home pursuant to Family Court Act § 1024.

Section 1024 (a) allows for an emergency removal of a child from the parental home when there is reasonable cause to believe that the child's continued residence therein would present an imminent danger to the child's life or health. Upon the emergency removal, ACS was required "forthwith" to file a petition (§ 1026 [c]). Five days later, an abuse proceeding was filed. A hearing was commenced on April 1, 1998, pursuant to Family Court Act § 1028. Family Court Act § 1028 requires that the parent, having experienced an emergency removal of children under Family Court Act § 1024, seek an order returning the children. The court, upon conducting a hearing, must grant the parent's application "unless it finds that the return presents an imminent risk to the child's life or health" (Family Ct Act § 1028 [a]). The court must also consider, where appropriate, whether reasonable efforts were made prior to the hearing to prevent or eliminate the need for removal (Family Ct Act § 1028 [b]).

At the hearing, the child's pediatrician testified for the agency that the child had been in good health when examined on March 20th and that although she had not been present when blood was drawn, she believed that she had seen the

child afterward and that the child had not been crying. She attended to the child the following day. The pediatrician testified that this type of fracture usually results from the infliction of force, exceeding that usually occasioned by falling off a bed, and that, although she did not know what happened during the phlebotomy, it seemed unlikely that sufficient force would have been used at that time to cause the fracture. An ACS case worker testified that she had interviewed the mother and the child's two siblings, that their narratives were consistent and that the children denied any abuse. The case worker related that the teacher of the child's 11-year-old brother had told her that the brother was very bright but aggressive and prone to fighting. The court continued remand at the close of the section 1028 hearing.

The fact-finding hearing commenced on June 16, 1998. The pediatrician testified that the mother always brought the child to appointments on time and she could not now recall if she had seen the child subsequent to the phlebotomy. The hospital's social worker testified regarding apparently conflicting accounts as to the mother's whereabouts the night before the fracture was diagnosed. The mother had initially related to her that she had left the child with the brother for 20 minutes the prior day so that she could drop clothes off at the laundromat. But the social worker telephoned the brother, who indicated that the mother had gone to "work" at the laundromat and had been absent from 5:30 P.M. to 11:30 P.M. The brother related to the social worker that during that time the child became fussy, leading the brother to carry him to the living room, from which he telephoned the mother. During a subsequent interview, though, the brother changed his narrative, claiming to have been scared and confused by the questioning, and now indicated that the mother had worked the prior night, and not the night following the phlebotomy. Counsel, at the close of the hearing, indicated for the record that the mother had been visiting the children daily, preparing food for them, and requested unsupervised visitation. The court, believing that the mother had urged the children to fabricate events, denied the request. Counsel objected on the basis that the mother denied any such conduct, but the court found the coincidence unlikely that the brother's narrative would be changed in this manner.

On the adjourned date, a radiologist testified for the agency that he found a spiral fracture unusual in a child who could not yet walk. Although he surmised that a child might break his arm by twisting it through a crib's bars while falling, he

found this "inconceivable." The radiologist rejected the possibility that sufficient force would have been employed during the phlebotomy to cause the fracture but allowed that an older child could have applied sufficient muscular force to cause the break. The mother herself testified that she had been instructed to hold the child firmly on her lap and to "grab him strong and squeeze him here," which she did. He continued to cry the rest of the day after leaving the hospital, would not take a bottle, and fell asleep only eventually. When she took clothing to the laundromat where she was employed on weekends, and hence calls "the job," she left the child with her 17-year-old daughter and her son, indicating that she would return shortly. She called the hospital that evening when she noticed that the child screamed when she touched his arm and, as previously indicated, was told to apply hot compresses and give him Tylenol. She spent the night awake with him. She still thought that she had hurt the child during the phlebotomy, but would never do so intentionally. The mother, through her attorney, did not submit any of her own medical evidence. The court, although speculating that the brother might even have been responsible, made findings of child abuse and derivative findings of abuse as to the other children.

On February 11, 1999, the mother, represented by new counsel and alleging ineffective assistance of prior counsel, moved to vacate the fact-findings of abuse and to reopen the hearing to introduce evidence from an orthopedist indicating that the mother's narrative was reasonable and that it was her medical opinion that the fracture occurred as indicated by the mother. Additionally, the mother sought to introduce an affidavit from a pediatrician at the Children's Advocacy Center also supporting the mother's narrative. New counsel also sought to introduce an ACS psychiatric examination of the mother indicating "no signs of psychopathology or psychosis now or ever. It would take a person that would be importantly mentally ill to harm a child in this manner and [she] does not manifest anything of this nature." New counsel conceded that the mother had, indeed, been absent from the home working as initially related by her son, but maintained that the injury had occurred not then, but in the hospital.

On the March 2, 1999 return date, ACS now recommended that the children, who had been removed for almost a year, be returned to the mother under ACS supervision. The court agreed. However, after an off-the-record discussion, the mother withdrew the motion to vacate. By motion dated April 1, 1999, the mother sought "reconsideration and reargument," which

we deem to constitute a request for renewal, of her withdrawal of her motion to vacate. The mother now contended that the court had indicated that if the mother pursued the motion to re-open the hearing, the children would not be returned to her pending the new fact-finding hearing, and that the mother had seen little choice but to withdraw her motion. In response, the Law Guardian insisted that vacatur of the abuse findings be conditioned on the mother's allocution to neglect and if that was not acceptable, that the fact-finding be re-opened to examine the new medical evidence. The motion to reconsider was denied by the Family Court.

The Law Guardian agreed that the children should be returned to the mother, albeit under supervision, and implicitly agreed that there was no abuse. On appeal, the Law Guardian now contends that the hearing should be re-opened to allow the mother to submit the very proof that the court resisted on the renewal motion. The real weakness of this entire proceeding, though, is that all of the children were removed on the basis of abuse, and the record's evidence of such, entirely circumstantial, is dubious at best. Although not dispositive, there is no history of abuse nor were there any injuries except for the one in question (*cf., Matter of New York City Dept. of Social Servs. v Carmen J.*, 209 AD2d 525 [multiple instances of past and present abuse, including bruises and burn marks]). Rather, at most, there was a single fracture in the context of no history of child abuse, unexplainable except for the mother's explanation, the basic facts of which were uncontradicted (*see, Matter of Eric G.*, 99 AD2d 835). Nor, in view of the mother's prompt response, a fact even noted on appeal by the Law Guardian, is there even evidence of neglect (*cf., Matter of Kevin R.*, 193 AD2d 351, *appeal dismissed* 82 NY2d 735 [spiral fracture; despite swelling, pain and lack of mobility, mother waited several days before seeking treatment]). As the Law Guardian argues on appeal, the mother's proffer of additional evidence under these circumstances warranted vacatur of the fact-findings of abuse and a re-opened hearing. Such evidence would have accommodated the legislative goal of requiring courts to develop a full and complete record in abuse proceedings to ensure the fairness of the determination (*Matter of Commissioner of Social Servs. [Anna B.] v Amine B.*, 223 AD2d 703). There was sufficient good cause for the court to have vacated its fact-findings to consider the new evidence (Family Ct Act § 1061). Under the unusual circumstances of this case, and especially considering the extended absence of the children from the family home during such a sensitive period of life for an infant, it is troubling that the court basically refused to

consider what appears to have been credible and material evidence proffered by the mother that could well have resolved the issues in dispute.

Accordingly, we reverse to the extent of vacating the fact-finding orders and remand for a re-opened hearing at which this evidence and, if necessary, additional material evidence, will be considered, upon which new fact-findings will be issued. Concur—Tom, J. P., Mazzarelli, Lerner, Rubin and Friedman, JJ.